MORGAN<br>v.<br>LATHROP.

12  259
46  929

## WIDOW BERNY DOUVILLE *v.* SUN MUTUAL INSURANCE COMPANY OF NEW YORK.

Where, by the terms of the policy of insurance, the party desiring to be insured, upon any particular shipment of merchandize, was bound to present to the Insurance Company an invoice of the goods, and pay or secure the premium to the company—*Held:* That on a policy of insurance in this form, there must necessarily exist as many contracts of insurance as the endorsements upon the policy of separate shipments of goods; that such contracts only became complete when the invoices of the goods were presented and endorsed upon the policy.

The assured under such a policy could not recover from the underwriters for the loss of goods the shipment of which did not appear by any bill of lading, and of which no invoice had been furnished to the company previous to the loss.

APPEAL from the Second District Court of New Orleans, *Morgan,* J. *J. Bermudez* and *E. Filleul,* for plaintiff.  *G. Schmidt* and *J. A. Maybin,* for defendants and appellants.

MERRICK, C. J.  This suit is upon a policy of marine insurance.  As we shall decide this case upon a single point, we do not deem it important to recapitulate all the facts, nor to notice the other questions presented by counsel in the elaborate briefs and arguments presented in this case.  We shall assume that the plaintiff had an insurable interest in the goods lost; that the suit was brought by proper parties, and that the preliminary proof was made.

The original policy which was, delivered on the fourteenth day of December, 1850, and was on goods and merchandize to be laden on board ——— vessels, contained this clause:

"This insurance is declared to be on merchandize, as interest may appear, adding ten per cent. to invoices.  The risks to attach from the time of shipment, which are to be reported to the insurers (on receipt of invoices) for indorsement."

On the 13th March, 1854, this modification was indorsed on the policy:  "It is agreed that this policy shall cover merchandize to the address of the assured, from European ports to New Orleans, via Boston or New York, subject to additional premium as per tariff."

*Amédée Berny Douville,* a member of the firm in which the plaintiff held the chief interest, having, in the summer of 1854, purchased a quantity of goods in Paris for the house in this city, wrote home, on the seventh of September, that his purchases were made, with the exception of a few articles for which he should wait until the last moment, in order to have the latest fashions; and he announced that he had retained his passage aboard the steamer Arctic for the 20th of September, and, that he would leave Paris on the 15th or 16th for London, to purchase fashions and "nouveautés."

After this letter was received, viz: about the 8th or 10th of October, a clerk of the firm informed the agent of the Insurance Company that *Mr. Douville*

was about to leave France with goods by the Arctic. The clerk was informed at the insurance office, "that it was all right, but that they would be compelled to wait the receipt of the invoice, in order to indorse this on the policy."

It is apparent, that at this time the members of the plaintiff's firm in New Orleans had no knowledge whether *Amédée Berny Douville* had carried out his intention of purchasing more goods in Paris or not, nor what was the amount of goods he intended to bring with him ; hence, at this time, there was nothing definite agreed upon which could be indorsed on the policy, and no premium was offered to be paid the company.

*Amédée Berny Douville* and a *Miss Eliza Revelle* (who was also sent out to Paris to assist in the purchases) sailed in the Arctic and perished in that ill-fated vessel.

Sometime after the loss of the steamship was ascertained, an agent of the house in Paris informed them by letter of the amount of goods which it was supposed *Mr. Douville* and *Miss Revelle* had with them, and furnished a list showing the amount and value and the various houses in Paris from whom the merchandize was purchased. The amount was 16,565 95-100 francs. The goods never reached New Orleans.

The testimony renders it probable that this amount of merchandize was packed in the trunks of these two persons and lost with them on the 27th of September. No bill of lading appears to have been taken of the steamer, nor any other evidence that the merchandize was shipped as a part of the cargo of the vessel. How these goods were carried in the trunks of the parties through England, is not explained.

After the list of articles was received from the agent in Paris, and the loss ascertained, the list was presented to the insurance office. The company refused to indorse it upon the policy or pay the loss.

It appears that goods to the amount of about 180,000 or 190,000 francs were purchased in Paris that season, after the departure of *Douville* from New Orleans, and only invoices to the amount of say $8166 were indorsed upon the policy previous to the information of the loss of the Arctic, viz : were indorsed on the 28th day of September, 1854.

This suit was instituted against the Insurance Company on the 25th day of October, 1855. Judgment was rendered against the defendants, on the verdict of a jury, for $3229, and the defendants appealed.

The question is presented by this state of facts, whether there was any contract of insurance relative to the goods lost upon the Arctic ?

We think it must be answered in the negative. By the terms of the policy, the party desiring to be insured upon any particular shipment of merchandize, was bound to present to the Insurance Company an invoice of the goods and pay or secure the premium to the company. When this was done and the amount of the invoice was indorsed upon the policy, the contract for insurance was complete. The plaintiff was not bound by her contract to report to the Insurance Company the 180,000 francs in value of purchases made by her firm in Paris, on the one hand, nor could the company demand of her the premium on this large amount, on the other. On a policy of insurance in this form, there must necessarily exist as many contracts of insurance as there are indorsements upon the policy of separate shipments of goods. The delivery of the policy four years previously did not constitute a contract of insurance upon goods which might be shipped by the Arctic. Something more was required,

viz: consent on the part of the plaintiff, a production of her invoices and the payment of the premium on her behalf, and a communication of the unusual manner in which these goods were intended to be brought over, viz, in the trunks of a partner and an employée of the house, as baggage; and on behalf of the company, an agreement to take the risk in this form. Nothing of this kind occurred. The company were informed that some goods were to be sent out by the Arctic, the unusual manner in which they were to be sent was not communicated. No amount was stated to the company, for the agents of the plaintiff did not then know what quantity of goods would be sent. No premium was offered, and if the Arctic had arrived in safety, the company would have been without power to collect the premium: the plaintiff would have been under no legal obligation to have paid it. The reply of some officer at the insurance office, that it was "all right," when informed that it was expected that goods would be brought out by the Arctic, was coupled with a reference to the terms of the policy which shows that the company did not intend to bind themselves beyond it. They informed the clerk "that they would be compelled to wait the receipt of the invoice, in order to indorse this on the policy." That reply, therefore, of some officer of the company, even if he had power to bind the company beyond the terms of the policy, created no obligation. Nothing was agreed upon beyond the policy. How then can it be construed to cover the loss of goods packed in the trunks of travellers, not subject to the payment of freight, nor covered by bills of lading, nor stowed with the cargo, nor contained in covers or boxes commonly subject to entry at the customhouse?

The company has a right to stand upon its written policy, and say to the plaintiff: *Non in hæc federa veni.* The goods were not, in a legal sense, *laden* on board the Arctic, nor were the invoices presented or premium offered, until the loss was ascertained.

It is, therefore, ordered, adjudged and decreed by the court, that the judgment of the lower court be avoided and reversed, and that there be judgment against the demand of the plaintiff and in favor of the defendants, and that the plaintiff pay the costs of both courts.