## CORPORATION OF THE LONDON ASSURANCE *v.* PATERSON, DOWNING & COMPANY *et al.*

1. Apparently the auditor, to whom this case was referred for the purpose of determining how a loss by fire should be adjusted as between the insured and each of several insurers, correctly found that an application for insurance presented by the insured to one of the insurers was not specific as to the precise property sought to be insured. But whether this be true or not, it affirmatively appears that no substantial right of the party complaining of this ruling was prejudiced thereby.

2. When a memorandum of a contract for additional insurance is endorsed upon a policy previously issued, the stipulations therein contained, in so far as the same may be applicable, are to be treated as constituting the basis of the new contract.

(*a*) In the present case, the endorsement contemplated additional insurance which should cover the entire interest of the insured in the property specified, not merely a three-fifths interest therein, which was the extent of the risk originally assumed.

(*b*) Even if error was committed in admitting parol evidence offered to show the intention of the contracting parties, no injury thereby resulted to the insurer.

3. One of the insurance companies being, in any event, liable to pay in full the amount expressed in its contract, the mere fact that the auditor estimated the value of the property destroyed upon an erroneous basis affords to this company no just cause of complaint.

4. Under the express provisions of what is commonly known as "the American clause," though it be contained in an "open" policy not immediately attaching to any specific risk, the date to be looked to in determining whether concurrent insurance is prior or subsequent "in day of date to this policy" is, not that upon which the policy attached to a specific risk, but that upon which the policy was issued

5. An insurer in no way interested in an adjustment made between the insured and a subsequent insurer is not in a position to question the correctness thereof.

Argued November 21, 22, 1898. — Decided March 4, 1899.

Exceptions to auditor's report.    Before Judge Sweat.    Glynn superior court.    April 26, 1898.

*Brantley & Bennet* and *W. W. McFarland,* for plaintiff in error.
*Goodyear & Kay, King & Spalding, Mercer & Mercer* and *Atkinson & Dunwody,* contra.

LUMPKIN, P. J.    Before undertaking to deal with the several assignments of error presented by the bill of exceptions in this case, it is proper to set forth a statement of some of the leading facts disclosed by the record, which will serve both to explain the nature of the controversy and to indicate the relevancy and materiality of the questions upon which rulings are invoked.    Paterson, Downing & Company, of New York City, were engaged in buying and exporting naval stores. They had agents, or business connections, at nearly all of the South Atlantic and Gulf ports, including Brunswick, Ga., through whom rosin and turpentine were purchased at inland points, transported by rail to these ports, and then loaded on vessels for export.    Desiring protection against possible losses by fire, Paterson, Downing & Company, during the fall of 1895, applied to the Thames & Mersey Marine Insurance Company and the Corporation of the London Assurance for insurance to the amount of $50,000, which should cover all naval stores subsequently purchased, not only whilst stored in warehouses at these several ports awaiting export, but also whilst in transit from inland points to the coast.    The company first named undertook to carry two-fifths, and the latter company three-fifths, of the insurance applied for, and accordingly each issued what is commonly known as an "open" policy, dated October.12, 1895, the purpose of which was to enable the insured, by simply reporting a shipment from a given point and agreeing upon the rate of premium, to immediately bring within the protection of the policy any particular consignment they might wish to be covered thereby.    Later, the insured applied to the Corporation of the London Assurance for additional insurance, to cover all naval stores while located at certain designated ports, the value of which should be in excess of the $50,000 for which they were, as above stated, al-

ready insured.    Thereupon, under the date of December 18, 1895, this company entered upon the policy previously issued by it the following endorsement:     "It is hereby understood and agreed that, upon notice from the assured, and from the time such notice is given, provided it be before known loss, this policy shall cover not exceeding $50,000.00 on the excess of $50,000.00 on goods as herein described, at the ports enumerated herein, for a period of not exceeding fifteen days; such period, however, to be renewable one or more times for other periods of fifteen days, each upon notice from the assured prior to the beginning of such other period, a premium to be paid for each period."     On January 11, 1896, the insured gave notice that they desired additional insurance on naval stores located at Brunswick, to the extent of $50,000, agreeably to this endorsement, for a period of fifteen days from that date; and the company accepted the notice and fixed the premium. Further notices were from time to time subsequently given and accepted, by which this insurance was extended for successive periods of fifteen days, the last notice stipulating that the period to be covered was from March 26 to April 10, 1896.     A loss by fire occurred on April 2, the greater part of the goods on storage in Brunswick being consumed.     Besides the insurance above referred to, the insured held a number of policies covering the same property, which had been issued by various fire-insurance companies at different periods during the latter part of the year 1895 and the early part of 1896.    An attempt was made to adjust the loss, but the several companies failed to agree among themselves as to the respective proportion thereof each should bear.    This gave rise to the present litigation, the purpose of which was to fix the liability of each, and to compel payment to the insured accordingly.    The case involved many complicated questions, both of law and of fact, and was referred to an auditor, who duly made a report covering all the points at issue.    Being dissatisfied with the auditor's findings concerning the adjustment to be made of the loss, the Corporation of the London Assurance filed numerous exceptions to his report; and the same being overruled and disallowed by the court below, that company now brings the

case here for review. Such other facts as are necessary to an understanding of the questions presented for adjudication will be stated in immediate connection with the points to which the same relate, and will be developed as occasion requires in the discussion which follows.

1. It appeared on the hearing before the auditor that a portion of the goods destroyed by fire arrived in Brunswick prior to October 12, 1895, and it was insisted by the London Assurance company that it was not liable, either under the policy issued by it on that date or under the endorsement of December 18, entered thereon, to pay any part of the loss sustained. Exception is taken to the finding of the auditor "that the several notices given under and by virtue of the endorsement of December 18, 1895, on the defendant's policy for the purpose of procuring excess insurance as thereby provided were 'silent as to the time of the receipt of the stuff designed to be covered by them.'" The record, however, shows manifestly that this complaint is without merit. In the first place, it would seem, the auditor's finding was in accord with the only possible construction which could be placed upon the language in which these notices were couched. Besides, notwithstanding the same did not specifically limit the operation of the insurance thereby effected to goods received subsequently to October 12, the auditor expressly announced his conclusion to be, that, in view of the parol evidence submitted, "it was the intention of the plaintiffs and the said London Assurance, as evidenced by their dealings, . . that this endorsement was not designed to cover goods received prior to October 12, 1895." Accordingly, in fixing the liability of this company, the auditor found it was answerable only for its just proportion of the loss on goods which arrived in Brunswick after that date, which ruling gave to this company the full benefit of its contention and relieved it of all liability as to other goods destroyed in the same fire.

2. Another question presented for determination is: what was the legal effect of the endorsement of December 18, above quoted, which was entered on the policy previously issued by the London Assurance? Obviously it was the intention of the

parties to provide for additional insurance, to become operative whenever the insured gave the required notice and the premium to be charged was fixed, upon the same terms and conditions, so far as applicable, as had been previously agreed on when the company wrote its policy covering the $30,000 risk originally accepted. In other words, the company agreed, if called upon by the insured, to increase the amount of insurance it had in the first instance undertaken to carry; and instead of issuing another policy containing the stipulations upon which such additional insurance was proposed, the plan was adopted of endorsing its proposal upon a policy already held by the assured, in which the terms and conditions upon which it was willing to insure the property in question were fully and distinctly set forth. The method pursued of evidencing this agreement on the part of the company was very similar to that commonly employed of extending the period for which a policy is originally issued, the only difference being that the endorsement now under consideration was intended to expressly fix the amount, as well as the periods of the insurance thus provided for. It is well settled that in the event a new contract is entered into between the insurer and the insured, it is not essential that the same should be evidenced by the issuance of another and distinct policy. On the contrary: "A policy of insurance may be renewed by the underwriters for an additional term beyond that mentioned in it, by the mere issuance of a renewal receipt or certificate; and this is the custom and practice in the insurance business." 7 Am. & Eng. Enc. L. 1011. In such case, "The renewal has the effect of a new contract, but upon the same terms and conditions as the old." Ibid. 1012. It follows, of course, that where the plan is adopted of evidencing a new contract of insurance by merely endorsing upon a policy previously issued a memorandum of the date, amount, and subject-matter of the additional insurance effected, the policy upon which such entry is made is to be looked to in ascertaining the terms and conditions governing the new contract. Accordingly, we hold in the present case that the endorsement of December 18 is to be regarded as equivalent to the issuance of an entirely new and distinct pol-

icy bearing that date and containing all the stipulations set forth in the policy issued by the London Assurance on October 12, save those the adoption of which this endorsement negatives, either expressly or by necessary implication.

(a) Recognizing the soundness of this conclusion, counsel for the insurance company in effect contend that as the policy issued on October 12 provided that the insurance thereby effected was "to cover three-fifths interest in all goods" therein designated, in an amount not exceeding $30,000, a proper construction of the endorsement of December 18 would limit the company's liability thereunder to "three fifths of the $50,000 excess insurance" provided for. We can not assent to this proposition. The amount and extent of the new insurance contemplated was specifically fixed by the endorsement in question, as was also the precise subject-matter thereof. In these respects, the additional insurance was not to be identical with the contract previously entered into. That is to say, the company in the first instance undertook to carry only three fifths of the $50,000 risk offered to it and the Thames & Mersey company; but when applied to thereafter, agreed to accept and carry the whole risk incident to the additional insurance of $50,000 which the insured desired to place on the property because its value was far in excess of the amount for which insurance had previously been procured. But even were this endorsement less definite in its terms, and susceptible of a different construction, the dealings between the parties pursuant thereto show beyond any question what they understood its meaning to be. Each of the several notices thereafter given by the insured, and accepted by the company, called upon it "to enter on open policy of Paterson, Downing & Co., No. 610, $50,000 on naval stores on excess of $50,000 located at Brunswick"; so, regardless of what the company by the proposal evidenced by the endorsement of December 18 intended to offer to do, it. subsequently, as matter of fact, actually granted the insured additional insurance to the full extent asked, viz. $50,000, and in each instance fixed the premium on that amount at "1/10 net."

(b) In this connection, complaint is also made that the au-

ditor improperly, over the company's objection, admitted "parol evidence offered to show that it was the purpose and intention of the parties at the time of the writing of the endorsement of December 18, 1895, on the policy of the London Assurance, that the said endorsement should cover [the property insured] to the extent of the whole of $50,000, and not merely three fifths of that amount; the objection being that the said evidence was immaterial and irrelevant, and further, that the policy and the endorsement make the contract the highest evidence of what was covered," etc.   The evidence objected to is not, as it should have been, set forth; so whether it established that which it was "offered to show" can not, of course, be determined.   But however this may be, suffice it to say that as the construction to be given the contract as evidenced by the writings before us is as above stated, the admission of this parol evidence could not have operated prejudicially to the company.

3. The policy of October 12 issued by the London Assurance company contained a written stipulation that the basis upon which the value of the goods insured was to be estimated, in the event of loss, was "invoice cost and ten per cent. added, unless otherwise agreed upon at time of endorsement." In almost every instance, prior to December 18, when a particular risk was reported and endorsed upon this policy, the quantity and value of the goods were specifically stated, but none of the notices given in pursuance of the endorsement of that date, evidencing the new contract, undertook to state the value of the goods thereby insured.   Exception was taken by the company to a finding by the auditor that, both as to the insurance effected under the contract of October 12, and as to that effected under the endorsement of December 18, premiums were fixed upon the basis of invoice cost and ten per cent. added, and accordingly the value of the goods destroyed was to be estimated upon a like basis.   Complaint is made that the company was thus held liable, under its policy of October 12, for the value of the goods at invoice cost and ten per cent. added, despite the fact that a given amount had been agreed on as the value of each shipment of goods insurance upon

which it had from time to time endorsed upon the policy. Doubtless, the finding complained of was erroneous, so far as the risks insured against by the original policy are concerned; but the error thus committed resulted in no hardship upon the company. It appears from an agreed statement of facts presented in behalf of the contending parties, and to the correctness of which each expressly assented, that the market value of the goods destroyed was over $80,000, whereas the invoice cost thereof was over $96,500. It further appears from the testimony of the company's agent that the insured, in reporting in each instance the value of goods to be covered by the policy, gave in only the invoice cost of the same, and this amount was, "in round numbers," endorsed upon the policy as the agreed value of the particular risk reported. So it will be readily seen that, whether estimated upon the basis of reported value, invoice cost, or market value, the goods destroyed were worth much more than double the amount of the face of this policy, which as originally issued was limited to $30,000, and the company was bound to pay this amount in full in any event. As to the insurance of $50,000 additional on the same goods, effected under the endorsement of December 18, the only proper basis for estimating the loss was that provided for in the stipulation above alluded to; for this stipulation became a part of the new contract, and as the value of the goods was not "otherwise agreed upon" in any of the notices given by the insured and accepted by the company, it became bound to indemnify them, in the event the goods were destroyed, upon the basis of "invoice cost and ten per cent. added" as the agreed value thereof. So far as this additional $50,000 of insurance is concerned, we understand the company to make no complaint of the auditor's finding, for none is presented by the exceptions filed in its behalf. We have deemed it proper, however, to call attention to the fact that, in view of the company's liability under the contract last above referred to, the only question of real importance to be determined was, the value of the goods estimated at invoice cost and ten per cent. added; for a further specific finding as to exactly how -much they were worth, taking into consideration only the agreed

values endorsed on the policy under the contract of October 12, could have served no practical purpose in determining whether or not the company was liable to pay in full its policy of $30,000.

4. The most important question in the case is whether or not, in view of the stipulation as to concurrent insurance contained in the policy issued by the London Assurance, the auditor correctly fixed the order in which the several companies issuing policies covering the property destroyed were to be held legally liable to make good the loss.   The stipulation referred to was as follows: "Provided always, and it is hereby further agreed, that if the said assured shall have made any other assurance upon the premises aforesaid, prior in day of date to this policy, then the said assurers shall be answerable only for so much as the amount of such prior assurance may be deficient towards fully covering the premises hereby assured; and the said assurers shall return the premium upon so much of the sum by them assured as they shall be by such prior assurance exonerated from.   And in case of any insurance upon the said premises, subsequent in day of date to this policy, the said assurers shall nevertheless be answerable, subject as hereinafter provided, for the full extent of the sum insured by this policy, without right to claim contribution from such subsequent assurers, and shall accordingly be entitled to retain the premium by them received in the same manner as if no such subsequent assurance had been made.   Other insurance upon the premises aforesaid, of date the same day as this policy, shall be deemed simultaneous herewith; and the said assurers shall not be liable for more than a ratable contribution in the proportion of the sum by them insured to the aggregate of such simultaneous insurance."   There were of force at the time of the fire four policies which had been taken out by the insured in different fire companies prior to October 12, 1895, the date upon which the London Assurance and the other marine company, the Thames & Mersey, issued their respective policies. These four were floating policies, and in general terms undertook to cover, during their continuance, all naval stores, the property of the assured, whilst stored in their warehouses in the city of

Brunswick, irrespective of the time such goods might be received at that point. Each contained an express stipulation, however, that the insurance thereby effected should not apply to any naval stores which, at time of loss, might "be covered in whole or in part by, or be under the protection of, any marine insurance or policy of any marine company." Another fire policy, issued after October 12, contained a similar stipulation. Accordingly, the auditor held that the five policies just referred to were limited to such goods only as were received in Brunswick prior to the last date mentioned, all goods thereafter arriving being covered by the policies of the two marine companies referred to. His finding therefore was, that as there was no prior insurance to be first applied to the loss on goods covered by the $30,000 policy issued by the London Assurance, this company should pay that amount in full, and that the Thames & Mersey company should, for a like reason, pay the full amount of its policy, $20,000. Up to this point, the plaintiff in error concedes that the adjustment made by the auditor was eminently just and proper. Besides the policies already mentioned, there were a number of others, some of which were taken out by the assured on January 7, and the rest on January 27, 1896. All were floating policies, covering goods received both before and after October 12, 1895. In all, this additional insurance amounted to $20,000; and it was earnestly insisted by counsel for the London Assurance that a ratable proportion of the fund arising from these policies should next be applied to the loss on goods received after the date last mentioned, and fully exhausted before that company could legally be called upon to pay anything further. The idea upon which this contention was based was, that this $20,000 of insurance was "prior in day of date" to that of force at the time of the fire, issued under and by virtue of the endorsement of December 18, 1895, entered upon the policy of the London Assurance, which latter insurance, the company asserted, did not go into effect until March 26, 1896, and accordingly was to be treated as "subsequent in day of date," agreeably to the express terms of its policy. The auditor, however, held to the contrary, and the main controversy here presented grows out of this ruling.

To fully understand the company's position, it is necessary
to follow closely, step by step, the argument submitted by
counsel in its behalf.   In the first place, attention is called to
the fact that the company, by the endorsement in question,.
proposed to insure the goods, "upon notice from the assured,.
and from the time such notice" might be given, provided it.
was before known loss, "for a period of not exceeding fifteen
days, such period, however, to be renewable one or more times
for other periods of fifteen days, each upon notice from the as-
sured prior to the beginning of such other period, a premium
to be arranged to be paid for each period."   In this connec-
tion, the cases of Orient Mutual Insurance Co. *v.* Wright, 23·
How. 401, and Douville *v.* Sun Mutual Insurance Co., 12 La.
Ann. 259, are cited in support of the proposition relied on, that·
the endorsement of December 18 constituted merely an execu-
tory contract, and no present and immediate risk was thereby
assumed by the company.    Thus far we concur.    See 1 Par-
sons, Marine Ins. 326, 327.    The next step taken is to point
out the fact that each of the notices subsequently given by the
assured and accepted by the company called for and effected.
an entirely distinct and independent contract of insurance, the
duration of which was expressly limited to a fixed period of˙
fifteen days, which was to expire by mere lapse of time and
thus become forever inoperative and essentially a thing of the.
past.    Accordingly, it was argued that the risk accepted by
the company under the last notice given by the assured on
March 25, 1896, went into effect on the following day and was
to continue until April 10 ; that all previous contracts had duly
expired, and that the only insurance granted in pursuance of˙
the endorsement of December 18, which was of force at the·
time of the fire, was that effected by this last notice.    To each.
of these propositions we unhesitatingly assent.   See authorities.
last above cited.    But as to the deductions to be drawn from.
the premises stated, we think the argument presented by the
able and learned counsel for the plaintiff in error departs from·
sound reason and utterly fails to establish the conclusion for
which they contend.    They concede that the legal˙effect of the·
endorsement of December 18 is the same as would have been.

the case had the company's proposal thereby made been submitted to the assured by issuing to them another and distinct policy bearing that date and containing the above-quoted stipulation as to concurrent insurance, which, as was explained on the hearing before us, is, in insurance parlance, designated "the American clause." We were further informed that such ·a proposal, thus evidenced, would constitute what is known as an "open" or "running" policy. By reference to Bouvier's Law Dictionary (vol. II., p. 430), we find this definition is usually applied to a policy "on which the value is to be proved by the ·assured;" however, "By an 'open policy' is also sometimes meant, in the United States, one in which an aggregate amount is expressed in the body of the policy, and the specific amounts and subjects are to be indorsed from time to time." See cases ·cited. We therefore accept as correct the terms suggested for designating the instrument now under consideration. Our attention was further directed to the exigencies policies of this description were designed to meet. They often necessarily differ from ordinary contracts of insurance, because it is not within the power of the assured to accurately describe, or even point out, at the time he applies for a policy, the property he desires ·covered, or give information as to its value. For instance, in the case before us, it appears the assured desired the policy of October 12 to cover future consignments of goods to them or their agents, not at that date even purchased; and therefore, the policy issued was necessarily left "open" and "running," so that subsequently such consignments might be brought within its protection. On the other hand, a policy left "open" may immediately attach to a specified risk, and nothing else ever subsequently come within its operation. In view of these considerations, it was contended by counsel for the company that, in determining whether or not an "open" policy evidences a ·contract simultaneous with, or prior or subsequent "in day of date to," other concurrrent insurance covering the same property, the date upon which such policy actually attaches to the risk and covers the property therein described, not the date upon which the policy was issued, should be accepted as the ·test to be, in any given instance, applied. "In other words,"

as counsel undertake confidently to assert in a brief filed in behalf of the company, "the time when a policy attaches to a particular risk is the efficient date of the policy. No other date is intended than that at which the policy takes effect by accepting a risk; all other dates are nominal, inoperative, and mere surplusage." In support of this proposition, authorities. are cited to the effect that the date which a policy bears is only prima facie evidence as to the time of its execution; and,. where two or more policies cover the same property, "in determining which is the prior insurance, it may be proved that a [particular] policy was subscribed on a different day from that of its date." See 2 Phillips on Ins., referring to the case of Lee *v.* Insurance Co., 6 Mass. 208; also, Potter *v.* Marine Insurance Co., 2 Mason, 475. It is to be observed, however, that neither of these cases sustains the proposition for which they are cited. On the contrary, they are merely authority for the time-honored principle that a person not a party to a contract, and neither subscribing nor accepting the instrument evidencing the same, is not bound by any recital therein contained ; while, on the other hand, a party to the contract is not, as against a third person, thereby precluded from showing by parol evidence that the instrument does not, as matter of fact, speak the truth. In both of those cases, the defense set up by the insurer, when sued upon its policy, was that the plaintiff held prior insurance upon the same property, as shown by another and distinct policy issued by a different and independent. company not a party to the action ; and the court simply held that while the date of this other policy was prima facie evidence of the time of its execution, either of the contesting parties was at liberty to show by parol what was the real truth in this regard.

We may add that we have not been cited to any case which sustains the contention upon which the plaintiff in error so earnestly insists. Indeed, all the authorities with which we have met during the course of our investigation of the question presented look unmistakably the other way. Alluding to the case of Seamans *v.* Loring, 1 Mason, 128, Mr. Phillips, in the second volume of his work on Insurance, § 1252, announces that: "It has been held that the clause as to a prior

policy relates to priority in date, and not in the commencement of the risk." In the case cited it appeared that the property insured was fully covered by a number of policies prior in date and subsisting at the time the policy in question was written, but before the risk could commence under any of these prior policies, they were canceled; yet, notwithstanding this, it was held that their effect was to exonerate the subsequent insurer from all liability under the policy written by him, and the assured.was entitled to demand a return of the premium. The following pertinent quotations will show the trend of opinion amongst text-writers: "When there are several policies on the same property and risks, by the general law on the continent of Europe and in the United States, by virtue of special clauses in the policy, they attach on the subject insured in the order of their *execution*; and where the sums insured exceed in the aggregate the value of the subject, the policies subsequent *in date* are discharged wholly or partially in the inverse order of their *execution*, until the whole amount insured is reduced to a correspondence with the value of the interest meant to be covered." 1 Duer on Ins. § 37. "The priority respecting which this provision is made is not a priority as to the *beginning of the risk*, but a priority in *effecting the insurance*, and is determined by ascertaining the actual time of making the contract. For this purpose the date is prima facie evidence, but not conclusive; for it may be contradicted by proof that the contract was made on another day. It is a general principle of law that the fractions of a day are not regarded; but if two or more policies are made on the same day, insuring the same property against the same risks, and the question of priority is material, this priority will be determined by ascertaining when on that day the first was made." 1 Parsons on Ins. 285–287. "If, in such a case, it be shown that one of the policies was in fact executed prior to the other, then, if the prior policy covers the whole interest, the underwriters under that policy must alone bear the whole loss, where the subsequent policy provides that the underwriters of that policy shall be liable only for as much interest as is uncovered by the prior policy. . . The question as to whether other

policies are prior in date should not be determined by the date of the *attaching* of the policies; the clause refers to priority·in date of *effecting* the insurance." 3 Joyce on Ins. § 2481, citing Deming & Co. *v.* Merchants' Cotton-press Co., 90 Tenn. 306, 17 S. W. Rep. 89, 13 L. R. A. 518, which case is precisely in point. It was therein distinctly ruled, that "there can be no contribution among the coinsurers where two or more open policies of different dates have been issued by different insurers for the same risk, subsequently attaching at same instant under all the policies, there being a provision on the face of each policy against contribution with insurers of prior or subsequent date. Each insurer's liability attaches, in such case, as of *date of his policy*, not as of *date of risk incurred*." The stipulation as to concurrent insurance, known as "the American clause," was in identically the same terms as in the policy now before us. It appears that, construing this clause, the chancellor before whom the case was tried held, "the question as to whether the fire-insurance preceded, was contemporaneous with, or was subsequent to the marine insurance, was to be determined, not by the dates of the respective policies, but by the date of the *attaching of the risk* under each." In announcing his decision, he assigned for this ruling the following reasons, which the full report of that case enables us to state in the precise language he employed : "I am of the opinion that, under the American clauses of the marine open policies, there was no insurance until the cotton was brought within their terms and became the subject of insurance. An open policy does not, ex vi termini, insure property until the property is brought within its terms. Hence, there is no insurance until then. The rule making the date of the policy the date of the insurance applies to valued policies, but not to open policies." But this reasoning was not accepted as sound by the higher court. On the contrary, Snodgrass, J., who pronounced its judgment, after reviewing in a very able opinion nearly, if not quite, all the authorities directly bearing upon the question, said : "We hold that the date of the policy, and not of the attaching of the risk, must govern. It is so agreed in express terms, and no reason is perceived why such an agreement might not be

made in contemplation of open policies. It is true that ordinarily the date of a contract is not material; but this is not true where it is specially made so in terms—where it is, among other things, an object contracted about."

The effective simplicity of this argument appeals to us irresistibly, and the conclusion reached is, in our opinion, entirely satisfactory. It would, of course, be perfectly proper for an insurance company to stipulate that the test for determining what was or was not insurance "prior in day of date" should be the actual date upon which an open policy issued by it really became effective by the acceptance thereunder of a definite risk. However, the stipulation known as "the American clause" obviously does not even remotely suggest such a test, but distinctly provides that the company shall be exonerated from liability only as regards "other assurance upon the premises aforesaid, prior in day of date to this *policy*,"—evidently referring to the instrument setting forth its proposal, not to the various contracts of insurance to be made in the future, from time to time, and evidenced by separate endorsements thereon. "*Policy*, or, more fully, policy of assurance or insurance, is the name by which the *formal written instrument* in which the contract of insurance is usually embodied is known." 2 Abbott's Law Dic. 286. We accept as true the statement made in the brief of counsel for the company that: "An *open* policy may effect no insurance and embrace no risk at the date of its issue. It looks to the future and successive dates. Unlike the standard form, which in all its terms relates to effecting present insurance of a defined subject-matter, open policies are merely *promises* to insure." Still, this presents no reason why the date of the instrument, or any other purely arbitrary date, can not be agreed upon between the insurer and insured as the time from which other policies are to be treated as subsequent. For instance, the date agreed upon might be Washington's birthday, or some other legal holiday, occurring in either a past, the current, or a future year; and this express stipulation would be binding upon the parties themselves, though not, of course, upon third persons not assenting to such an arbitrary arrangement. Indeed, a company might agree that no insurance

should be deemed prior in day of date to its policy unless issued more than five years previously, or stipulate that it should be primarily liable under its policy regardless of prior insurance.   That each endorsement upon an open policy constitutes a new and independent contract of insurance can have not the slightest bearing upon the question in hand.   The policy may, indeed, when issued, amount to no more than a bare promise to insure, purely unilateral and too vague and indefinite to be capable of enforcement in a court of justice.   But these considerations in no way affect the character of the proposal of the company thereby made, which in substance is, that each and every contract thereafter entered into and duly endorsed upon the policy shall be governed by the stipulations therein contained — including, of course, "the American clause."   It matters not at what time any particular endorsement be entered, whether the day after the policy is issued, or a week or a year thence,—the pregnant fact remains that, when such endorsement is made, the stipulations set forth in the policy immediately become part and parcel of the contract thus effected, and this is true be it entered into agreeably to the first, the last, or any intermediate acceptance by the assured of the company's open proposal that, if given a risk at any time during the continuance of its policy, the date upon which that instrument was issued shall control in determining what is, or is not, to be regarded as prior insurance.

To hold otherwise than we do in the present case would surely lead to absurd results.   For illustration, suppose two open policies, each containing "the American clause," were simultaneously issued on a given date by different companies, with a view to insuring the same property.   In the event a particular risk was reported and endorsed upon one the following day, but a week or more elapsed before this risk became covered by the other, could not the company issuing the policy last referred to fairly claim the insurance effected under the other policy was "prior in day of date to" its policy?   If so, occasion would soon arise, in the course of numerous like transactions, which would warrant a similar claim on the part of the other company, and so on indefinitely, one company hav-

ing an undeserved advantage over the other one day, and being heavily involved in liability the next. The spectacle thus presented would be suggestive of a game of leap-frog, a counterpart of which we would hesitate to introduce into the law re-. lating to fire-insurance contracts. The case now before us furnishes an example of the mischief which would follow such a step. The fire companies writing the insurance which the plaintiff in error claims is "prior in day of date to" its proposal of December 18, issued their respective policies long after that date, for a term of one year, presumably relying upon the assurance given by "the American clause," contained in its policy, that they should be regarded as subsequent insurers. Thereafter they remained passive, silently awaiting the issue. The London Assurance, on the other hand, in accepting from time to time separate risks for successive periods of fifteen days, displayed an ever-continuing activity. At first, these acceptances antedated the time when the fire companies ventured to assume the risk undertaken by them; soon, however, by mere lapse of time, some of these antecedent acceptances became inoperative and were replaced by others, so that those shortly anterior to the fire bore a subsequent date. The fire companies were rooted to the spot they originally occupied, unable to effect a change in their situation; whereas, the London Assurance was constantly moving and advancing its attitude, until it eventually outstripped them in point of time. We can not give countenance to such an unequal and one-sided race. After, in a sense, practically inviting the fire companies to assume liability as subsequent insurers, with the distinct assurance that they should to the end of their term occupy that situation, the plaintiff in error can not consistently claim an advantage over them simply because of the totally irrelevant circumstance that the last risk it assumed under its proposal of December 18 was not actually accepted until the following March. In view of the confusion and serious embarrassments which would inevitably arise if, in passing upon disputes as to priority, the date of the attaching of each separate risk, rather than the date of the policy itself, was accepted as the proper criterion, we can not doubt that the insurance companies which write open poli-

cies containing "the American clause" do so understandingly and advisedly. But be this as it may, we are not now called upon to decide what will, independently of this clause, constitute prior or subsequent insurance, but simply to determine the character of the fire-insurance above mentioned, tested by the somewhat arbitrary rule which this clause expressly and plainly provides. Our conclusion upon this question is reached without serious misgivings.

5. The remaining point to be considered is controlled by what has been announced in the preceding division of this opinion. Complaint was made that the auditor, in effecting an adjustment of the loss on goods received in Brunswick prior to the date the London Assurance wrote its policy of October 12, held that certain companies whose policies covered these goods alone were, under the express terms and conditions thereof, entitled to demand contribution from the several fire companies whose policies covered indifferently goods arriving both before and after that date. In so far as the respective rights of the insured and of these two classes of insurers are concerned, the adjustment made would seem to be eminently proper and just. See 4 Joyce on Insurance, § 3457, and cases cited. At any rate, no one of these parties is before this court in the attitude of a plaintiff in error. As to the London Assurance, having failed to establish its contention that the floating policies just referred to constituted prior insurance relatively to that written under its proposal of December 18, obviously it has no interest whatever in this particular matter, and is not, therefore, in a position to urge any objection to the action taken by the auditor in regard thereto.

*Judgment affirmed. All the Justices concurring.*