DELAWARE INS. CO. OF PHILADELPHIA v. S. S. WHITE DENTAL MFG. CO.

(Circuit Court of Appeals, Third Circuit. May 22, 1901.)

No. 14.

1. MARINE INSURANCE—CONTRACT—MODIFICATION BY COURSE OF DEALING.

Libelant exported large quantities of dental goods of its manufacture, and for more than 30 years carried an open marine cargo policy, issued by respondent, renewed from time to time, without any change in its provisions. Such policy was not one covering all shipments made by libelant, nor requiring it to insure all shipments made by libelant, nor requiring it to insure all shipments thereunder, but contained the following provision: "No risk to attach to the policy until the amount and description of the same shall be approved and indorsed thereon by the company, and to be valued at the sum so indorsed." It also provided that the premium should be agreed upon at the time of such indorsement. By a course of dealing between the parties extending over many years, and adopted for mutual convenience, owing to the large increase in libelant's business, no indorsements were made on the policy, but each risk was reported by libelant on a slip furnished by respondent, and they were entered by respondent each month in a pass book which it also furnished. Such slips were filled out by libelant and sent by mail after it received the bills of lading, and were often not received by respondent until the shipments had been several days at sea, and sometimes not until after they had arrived at the port of destination, although it did not appear that such fact was known to respondent. During such time no risk so reported had ever been rejected on account of any objection thereto. Neither was the premium agreed upon at the time of each shipment, but respondent furnished libelant from time to time with a schedule of rates which governed as to future shipments. *Held*, that there was nothing in such course of dealing which abrogated the vital provision of the policy retained in each renewal, requiring each risk to be approved before it should attach, or which bound respondent to approve a risk the report of which was not received until after it was known that the shipment had been lost, it not appearing that it had ever done so previously; the fact that it had never rejected a risk being evidence merely that such risks had all been acceptable.

2. SAME—ACCEPTANCE OF RISK.

The fact that a clerk in the office of respondent, whose duty it was as a matter of routine, had received the slip sent by libelant reporting such risk, and had filled in the premium and checked the same for entry in the books, did not constitute an acceptance of such risk by respondent, where the clerk had no authority to accept or enter risks when any facts were known which rendered them unusual, and where prompt notice was given to libelant of its rejection.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania.

For opinion below, see 105 Fed. 642.

Theodore M. Etting and John G. Johnson, for appellant.

Henry N. Paul and R. C. Dale, for appellee.

Before ACHESON, DALLAS, and GRAY, Circuit Judges.

GRAY, Circuit Judge. This action was instituted by a libel in admiralty brought in the district court by the S. S. White Dental Manufacturing Company, a Pennsylvania corporation, against the Delaware Insurance Company of Philadelphia, also a Pennsylvania corporation, to recover $17,065.65, with interest from October 1, 1898; this being the value of certain goods belonging to the libelant which were lost by the sinking of the steamship La Bourgogne on July 4, 1898, and which are claimed to have been insured with the insurance company by reason of an open policy of marine insurance issued by the insurance company to libelant. The appellee exports to foreign countries large quantities of dental goods of its own manufacture. Such of its foreign shipments as it insured have been insured for a long period of years with the appellant; the insurance having been effected under a policy that was in force prior to 1867, and has been continuously renewed since that time. The last renewal was on January 1, 1895. This policy is what is called an "open policy of marine insurance," and is attached to the front page of a blank book furnished by the appellant, having printed on the outside thereof: "The S. S. White Dental Manufacturing Co., Open Policy with the Delaware Insurance Co. of Philadelphia." This book has its pages divided into 10 columns, headed respectively as follows: "Date," "Name of Vessel," "Place of Shipment," "Place of Destination," "Description of Goods, and for Whose Account Insured," "Amount to be Insured," "Rate of Premium," "Amount of Premium," "Date of Approval," "Signature." This policy contained the following clause: "No risk to attach to the policy until the amount and description of the same shall be proved and indorsed thereon by the company, and to be valued at the sum so indorsed." For a number of years the appellant had printed, and furnished to the appellee, blanks or slips, which were invariably used by the appellee after invoices had been received, to inform the appellant of the amount and description of the risk, and to request insurance thereon. On the 6th day of July, 1898, the appellee filled up one of these blank slips as follows (the parts written in by appellee being italicized):

"Philadelphia, *7/6,* 1898.

"The Delaware Insurance Company of Philadelphia: Insure, *under open policy* No. ———, $17,108 *on Mdse.* valued at $———, per S. S. *La Bourgogne* at and from *New York* to *Le Havre, France, thence R. R. to Zurich, Switzerland, a/c J. M. Ravel.*

"$——— at —%.                    The S. S. W. D. M. Co."

This notice, together with several others, covering appellee's shipments by other vessels, in due course of mail reached the appellant

on the day of its date. It was received at the post office, as shown by the stamp on the envelope, at 12:30 p. m., and was received at the office of the appellant at about 2 p. m. on the same day. Both companies at that time were aware that there had been a total loss of the goods. About the time that the notice was received, and while the clerk who attended to such matters had it in his hand, a clerk from the appellee came into the appellant's office and asked if the notice had been received; stating that it had been sent in due course of business, and that as the Bourgogne was lost, and there was a large amount involved, they were anxious to know if it were all right. He was told by this clerk that he would have to wait until he consulted the officers of the insurance company, and that he would telephone him later in regard to the matter. It appears that this clerk marked this slip, as he did others, with the amount of the premium, checked it, and, by the advice of the vice president of the appellant company, crossed over to the agency of the British-American Insurance Company, with whom the appellant had a contract for reinsurance, to consult him in regard to the same. He was there advised not to accept the insurance. On the day following, the president of the insurance company informed the president of the dental company, the appellee, that the insurance was declined, and on account of this refusal by the appellant this suit was brought in the court below.

To the obvious defense growing out of the stipulation already quoted from the policy, that no risk should attach to the policy until the amount and description of the same were approved and indorsed thereon by the company, the appellee, libelant below, interposes the following proposition, upon which it claims to be entitled to recover. This proposition is as follows:

"(1) The written policy was not, at the time of this loss, the actual contract between the parties. The real contract, as is evidenced by a course of dealing established for many years, did not require acceptance, fixing of premiums, and indorsement of each special risk as a condition precedent to insurance, but was similar to an ordinary open policy, by which all of libelant's foreign shipments, of the class subject to insurance, were insured at a fixed rate, subject to the requirement that such shipments should be reported to the insurance company, in the regular course of business, for subsequent indorsement on the pass book, and computation and collection of the premiums due thereon. In other words, premiums had been agreed upon, acceptance was waived, and indorsement had become a condition subsequent."

The position of the appellee, the libelant below, is that, notwithstanding the express stipulation of the policy which had existed for so many years as the evidence of the contract between the parties, and which had been expressly renewed in 1895, a supplemental contract had been made, in which all the conditions of that stipulation were abrogated, and in lieu thereof the appellant insurance company had undertaken to insure all foreign shipments of the appellee which it (the appellee) should elect to report. The question of varying or contradicting a written instrument is not involved in the position thus taken, by which a new contract is asserted to have

been substituted by the parties for the old one. It is not denied that the parties to a written contract may, by express oral agreement, change or alter the terms of such contract, so that the real, subsisting contract as to the matter in hand will be evidenced partly by the written agreement, and partly by the oral agreement. Such changes and modifications may also be evidenced by a course of dealing with regard to the subject-matter of the written contract so clear and unequivocal that no other inference can be drawn therefrom than that such change or modification was intended to be, in respect to the particular matter embraced in the course of dealing, the real agreement of the parties. In such case, however, the burden rests upon the party asserting such change or modification to show that the same has been made, as clearly and satisfactorily as it could be shown by an express oral agreement to that effect. The stipulation of the policy which the contention of the libelant thus disposes of and eliminates therefrom is, as already quoted, as follows: "No risk to attach to the policy until the amount and description of the same shall be approved and indorsed thereon by the company, and to be valued at the sum so indorsed." Further on in the policy, and not directly following the foregoing, is this clause: "Premiums as may be agreed upon at the time of indorsement to be settled monthly in cash." It is not denied by the libelant and appellee that under the policy, as written, with this stipulation therein, no liability in this case accrued to the appellant. These stipulations, it will be observed, contain three conditions upon which the liability of the insurance company is made to depend: (1) Approval of the amount and character of the risk; (2) an indorsement thereof upon the policy by the company; and (3) agreement as to the premium at the time of indorsement. The first condition is essential and vital to the contract of insurance evidenced by the policy. It undoubtedly qualifies the usual unrestricted terms of an open policy of insurance upon all shipments made, and gives it its essential restrictive character, by which each shipment must be the subject of a distinct contract. The difference between the contracts of the policy with and without this condition is so vital and far-reaching as not to be lightly regarded. The whole character of the contract of insurance depends upon its presence or absence. The other two conditions, however, are of a different kind, and do not so nearly concern the essential contract of insurance. The indorsement of amount and approval upon the policy by the insurance company is comparatively unimportant, and does not relate to the contract of insurance itself. It may well be either a condition precedent or subsequent; but the stipulation for approval can be nothing but a condition precedent, for without it no risk would be assumed, and no contract of insurance would exist. The third condition of the stipulation, as to premiums, though, of course, vital to the contract and to the assumption of risk, as constituting a condition precedent, would be, in a measure, subsidiary to the first condition. The learned judge of the court below was of opinion that this first condition, requiring an acceptance of the risk by the ap-

109 F.—22

pellant, in order to complete the contract of insurance as to each shipment, of which it was notified, as expressly stipulated in the policy, had been abrogated by a course of dealing between the parties that he found was wholly inconsistent with the stipulation in question, and that a new agreement was substituted therefor, by which the appellant undertook the risk of every shipment of the appellee from the time it was made, of which the appellee elected to send a notification. He says:

"In my opinion, this is the whole case. For many years, with one or two exceptions, the respondent has treated the libelant's outward-bound shipments of which the respondent had notice as covered by the policy, not merely from the time when notice was received, but from the time when the voyage began. Premiums to a large amount have been paid and received upon this understanding, and as long as no losses occurred the respondent was content that the practice should continue; but, as soon as a loss of significant size happens, then, for the first time, the disregarded provision is appealed to, that requires an acceptance of each particular risk before the respondent's liability shall attach. I cannot believe that this appeal should be sustained. In my opinion, the respondent was bound by its course of dealing to accept the risk in controversy. The risk was precisely the same as in hundreds of other instances that had been accepted without question. The goods were like those that had been previously shipped; the vessel was a first-class ocean steamship; the ports of departure and arrival were within the policy; the rate of premium was agreed upon; and nothing remained to be done, except notice to the respondent, and the formal acceptance that had never yet been withheld. As it seems to me, the libelant had acquired a right to rely upon the respondent's acceptance of every such risk as this, and the respondent had disabled itself from refusal. It could not suddenly depart from the unbroken custom, that had been so long established, without previous notice of its intention so to do."

Was the learned judge correct in this finding of fact, and in the conclusion of law deduced therefrom? This question underlies all, or nearly all, of the numerous assignments of error, and its determination will dispose of them, without the necessity for separate consideration. Does the evidence, then, contained in this record, disclose such a course of dealing as makes manifest and clear the abrogation of the first condition of the stipulation of the policy above referred to, viz. approval by the appellant of the amount and character of the risk, and the substitution therefor of a contract of such entirely different character and scope as the insurance by appellant of every shipment which the appellee may elect to report? If such alteration and substitution were made by express contract, written or oral, it would be required that the intent of the parties to that end should clearly and unequivocally appear. Of such abrogation and change, by express contract, we have an example in what was done by the parties in this case in regard to the abrogation of the third condition of the stipulation referred to, namely, agreement as to premium at the time of indorsement; for, as stated in the bill and admitted in the answer, after 1897 the rates of insurance were fixed by a letter written in that year, containing a tariff or schedule of rates, agreed upon by the parties, as to all of the places to which the dental company made shipments. The finding of fact in this regard by the court below is as follows:

"(b) Instead of premiums 'as may be agreed upon at the time of indorsement,' the parties specially agreed, by written schedule, upon certain fixed rates to all points to which libelant made shipments. · The last of such agreements is embodied in a letter from the respondent dated November 8, 1897. Inter alia, this fixed the rates to European ports at one-fourth net."

The condition that premiums should be agreed upon at the time of indorsement was therefore waived by the express understanding referred to between the parties. This much must be admitted as a fact in the case, as to which there is no dispute by counsel on either side. But here the supplementary agreement, which waived the condition in regard to premiums, was express and unequivocal. No inference can be drawn from this waiver in support of the existence of an agreement to waive the vital condition that no risk should attach until the appellant had approved its character and amount. In fact, it emphasizes the necessity and importance of requiring that the evidence of a waiver must be clear, beyond doubt or cavil. As there is no direct and express agreement that can be referred to as abrogating this condition, the usage and course of dealing from which we are asked to infer such an agreement between the parties must not only be established by unexceptionable evidence, but must be of such a character as to make such inference an absolutely necessary one. The position of the appellee in this respect is not strengthened by the admission that the unessential requirement of the indorsement of the amount and description of the risk upon the policy was by usage and the course of dealing changed from a condition precedent to a condition subsequent. Whether it were one or the other, it would matter little to the appellant, as in any event the indorsement was to be made by itself after the amount and character of the risk were approved. We cannot agree, therefore, with the contention of the appellee that "the three conditions named are so closely related, both logically and historically, as to render the abrogation of one and the retention of another inherently unlikely and unreasonable." As already seen, an express agreement in regard to the change in the third condition was in evidence, and not disputed. And the waiver of a literal conformity to the second condition was, as we have shown, without importance, and bore no relation to the existence or nonexistence of the first essential and vital condition of approval. A waiver of the essential right of accepting or not accepting an offered risk is not to be held as established by or as inherent in the disuse of the prescribed form of evidencing an acceptance. We must consider the course of dealing independently of its applicability to the indorsement condition, and it must point, with a clearness and certainty that excludes all doubt, to a new understanding between the parties, if it is to change the character of the contract between them. For a number of years,—how many it does not appear,—the appellant has printed the blank books, already referred to and described, in which were made by it the entries of the risks assumed, with the particulars of amount and description, instead of indorsing the same upon the policy itself. This was more than a convenience. It had become a necessity, from the amount of

business transacted. At first the policy was folded and pasted on the inside of the front cover of the current pass book, in which was written:

"It is hereby agreed that all approved indorsements on this book are to apply in all respects to policy No. ———, the same as if indorsed on said policy, and not otherwise."

Afterwards the policy was left pasted in one of the old books, filled with indorsements, and new pass books were issued, without any policy being attached thereto. These pass books were filled up by appellant, under the separate headings, after a risk was reported and accepted, at the convenience of the appellant company. The appellant company also furnished the libelant with blank insurance orders, called in the record "slips," above referred to, and one of which, filled up by the libelant, has already been quoted. The libelant could not, and did not attempt to, fill out these slips until after receipt of information from New York which enabled it to fill in the name of the vessel and the amount of the shipment. The slips thus filled in were sent to the appellant at intervals, often in batches of a half dozen or more, and usually through the mail. By the time these slips reached the appellant company, the vessels containing the shipments reported had often been at sea some days. The appellee has produced a witness who has gone over the files of the New York Herald, and extracted from the shipping news therein the dates of sailing and arrival of steamers carrying shipments of the appellee through a series of years. In quite a large number of instances it appears from these reports that the vessel had arrived before the slips reached the appellant company, but it is not shown that in any of these instances this information had reached the appellant, or that they knew in any other way of such arrival; and in two instances, also, it is shown (one of them in 1888) that where ships had arrived at destination before notification of risk the appellant company had refused to accept the premium, and had so notified the appellee. It does not appear that any comment or criticism was made upon this refusal by either party. It also appears, by a reference to the policy, that the shipments of goods were insured for two days after their arrival in port, and until they were safely landed; and it also appears that it was quite common, as in the case of the shipment on the Bourgogne, that the insurance extended not only to the end of the sea voyage, but to the carriage by rail from the port of arrival to an inland destination. Although it is to be inferred from the evidence that for a number of years, and antedating the last policy of 1895, all the foreign shipments of appellee, except those insured by its consignees on their own open policies, were insured with the appellant, it does not appear that it was considered, either by the appellant or the appellee, that appellee was bound to insure all such shipments. On the contrary, there is nothing to controvert the inference, to be drawn from the language of the policy and the mode of doing business, that the appellee had the option to insure as to any of its foreign shipments. The supplementary agreement sought to be set up by the

appellee, that the appellant company was obliged to insure each shipment, from the time it was made, which the appellee chose at any time to report, is not, therefore, supported by any reciprocal obligation on the part of the appellee to insure every such shipment. It is true that, for at least a period of 10 years prior to the loss of the Bourgogne, there is no evidence that any risk reported by the libelant had ever been objected to. But if the appellant had the right to approve or reject any risk proposed, as expressly reserved to it in the written contract of insurance between the parties, it could not lose that right by always having theretofore accepted unobjectionable risks. Under the policy, as it was written, there was required a distinct contract of insurance upon every shipment, and therefore it was necessary that there should not only be a report or offer of a shipment for insurance, but an acceptance of the risk on the part of the insuring company. The fact that 100 or 1,000 such contracts were made during a period of one year or ten years cannot create an obligation of indemnity on the part of the appellant in the one instance where no such contract has been made. In other words, because the appellant always accepted in cases where there was no reason not to do so, it cannot be taken to have accepted in the only case where there was reason not to accept. It is true that in this long course of dealing between the parties a routine practice grew up of sending notifications of shipment oftentimes several days after the sailing of the vessel containing the same, and the notifications so sent were received by the marine clerk, and marked with the amount of premium, and checked for entry in the open-policy book, without any notification of acceptance being sent to the appellee. This somewhat loose practice probably grew out of the uniform acceptability of the risks which in such large numbers were dealt in between the parties, and the mutual confidence which had naturally grown up in a course of business so long and so honorably conducted. We therefore find that no question was ever made as to apportionment of the risk, though several days of the voyage had elapsed before notice of shipment was received. The risk was considered entire, lost or not lost, as long as no information as to loss was possessed by either party. We see, then, nothing inconsistent in this course of dealing with the existence of the right in the insuring company, as reserved in the policy of insurance, to accept or reject a given risk. It is not pretended that prior to the present case any insurance was ever demanded or given upon a shipment after information of the loss had been received. The "lost or not lost" clause was obviously meant to cause the risk to attach to a case where a loss might have occurred at the time of the undertaking, though no information of the same was possessed by either party.

In the present case we are asked to change a policy expressly restricted to risks which the insured should elect to report, and the insurer to accept, to an open and unrestricted one, in which a complete contract of insurance is made beforehand, at the time of the execution and delivery of the policy, as to all shipments made by the

assured, and which would manifestly cover a shipment not reported until after it was lost. In such a case the contract is made once for all at the beginning, and the risk as to whether any shipments shall be lost in future is undertaken at that time. It is, then, a real risk, because the loss had not been made at the date of the contract. But here, under the terms of the policy as written, the report of the shipment on the Bourgogne, being made after the loss was known, presented no risk, and none had ever attached to such a shipment. We are asked to change this policy, as written, into an open and unrestricted policy, as above described, upon the evidence of dealings that never included such a distinctive transaction as specially characterizes the unrestricted open policy contract sought to be set up. That the appellee understood the difference between the contracts embodied in the two kinds of policies is evidenced by the fact that for some years previous to July, 1898, it had a policy issued to it by the appellant, with reference to goods coming from abroad, in which the contract was open and unrestricted, and without the condition as to approval contained in the policy as to outward-bound shipments, and by its terms covered all importations from the time of shipment abroad. The insurance company, upon the execution of this open policy, agreed to insure each and every risk thus shipped, up to a certain amount. If the assured made no declaration, the underwriter could claim that the property was covered by the policy, and that a premium was due it for insuring the same. The liability of the underwriter existed whenever notice was given by the assured, provided it was given seasonably or in accord with its undertaking as expressed in the agreement. The existence of this policy taken out by the appellee with reference to inward-bound goods is very significant in its bearing upon the question of what was the real understanding between the parties in regard to the policy on outward-bound goods, with which we are concerned in this case. On the outward policy no premium attached until the risk was offered, accepted, valued, and indorsed. The right was a reciprocal one, arising out of each offer, as and when made, and the dental company elected to insure when it thought fit. It is still more significant, if the testimony of Mr. Smith, the assistant secretary of the appellee, is to be believed, that in 1893 a request was made by the appellant company that such a policy as was held as to inward-bound goods should be taken out as to outward-bound goods by the appellee, and that this request was refused by it. After a careful reading of all the testimony in the case, we have been unable to discover any facts, course of business, or dealings which would justify us in now changing the policy, as written, into the open and unrestricted policy that appellee had taken out as to inward shipments. It must be manifest that the course of dealing from which we are to infer so important a change in a contract as the one in question here must relate particularly and specially to the very matters and things which mark the essential difference between the contract as written and that sought to be thus set up. It is not pretended here that there has ever

been, in the whole course of the dealing between the parties to this policy of insurance, any offer or suggestion that a known loss should be covered thereby. Much less has there been any evidence of any consent on the part of the appellant to pay such a loss. The evidence of the routine practice of the parties under the contract of the policy, and upon which appellees are forced to rely, as it seems to us, only went to the extent of showing that through a series of years none but acceptable risks were offered, and that none were rejected, and that no notice of the acceptance of risks was ever made to the appellee. It would be a violent presumption, we think, that for this reason appellants are to be held to have waived the right to accept, or not, any risk that was offered. The most, it seems to us, that can fairly be inferred from such a course of business, would be that, unless appellant should notify the appellee of the rejection of a risk within a reasonable time after the reception of the notice, it should be held to have accepted it. It is on this point that the case turns, and it is here that the learned judge of the court below seems to us to have misconceived the real character of the dealings, from which he drew the necessarily erroneous conclusion that the parties had intended to make a new agreement. In the passage already quoted he says:

"In my opinion, the respondent was bound by its course of dealing to accept the risk in controversy. The risk was precisely the same as in hundreds of other instances that have been accepted without question."

But the risk was not "precisely the same as in hundreds of other instances." It is true, "the goods were like those that had been previously shipped," that "the vessel was a first-class ocean steamship," that "the ports of departure and arrival were within the policy," and that "the rate of premium was agreed upon." But the character of the risk was different from any other that had ever before been accepted or even presented. This is the crucial point in the case. No number, however great, of such previously accepted risks, could have any relation to or bearing upon the right to reject such a risk as this, which in fact was no true risk at all. It was a question of the obligation to accept liability for a loss already ascertained. If the parties were bound by the terms of the contract of insurance, as written in the policy, there can be no question as to the right of appellant to accept or not accept the risk on each particular shipment as made and reported. The contention that this express written contract was changed into a contract by which the insurance was made once for all, at the date of the policy, upon all foreign shipments, whenever reported by the appellee, is sought to be supported by evidence of a course of dealing in which no case like the present had ever occurred, and in the course of which no transaction has ever been testified to that was clearly inconsistent with the continued reservation of that important and vital stipulation as to the right to accept or reject a given risk. We are compelled to the conclusion that there is no evidence disclosed by the record in this case upon which a waiver of this important condition expressly stipulated for in the policy

can be held to have been made; that the real contract between the parties at the time of the shipment here in question was, in this regard, as written in the policy; and that no other and different contract has been substituted therefor, either as evidenced by any express agreement, or by an established course of dealing. Very few decided cases, either in this country or in England, have been cited or found, bearing upon the principles of construction involved in the conclusions we have reached. We think, however, they are supported by the ratio decidendi of the following cases: Douville v. Insurance Co. (1857) 12 La. Ann. 259; Insurance Co. v. Wright (1859) 23 How. 401, 16 L. Ed. 524; Hartshorn v. Insurance Co. (1860) 15 Gray, 240; Platho v. Insurance Co. (1866) 38 Mo. 257; Schaefer v. Insurance Co. (1870) 33 Md. 109. We have carefully read and considered the cases cited and printed at length in appellee's brief, and much relied upon by them at the argument, viz.: E. Carver Co. v. Manufacturers' Ins. Co. (1856) 6 Gray, 214; Emery v. Insurance Co. (1885) 138 Mass. 398. The decisions in these cases must, of course, be read with relation to the particular facts upon which they rest. So reading them, we find nothing at variance with the principles of construction upon which we have so far discussed the present case.

In the case of E. Carver Co. v. Manufacturers' Ins. Co., the policy contained the following clause:

"$25,000 on cotton gins and bandings on board any steamer or steamers at and for New York and/or New Orleans; all sums placed at risk under this policy to be indorsed thereon, and this policy is to be closed in twelve months unless sooner filled. Gins and bandings valued at $25,000 each, including premiums."

The facts were as follows: On the 25th and 26th of August the defendant shipped 16 gins from New York for New Orleans. A bill of lading therefor was issued by the steamship company on the 26th, and was received by the plaintiff on the 27th. On the evening of the 26th the steamer was burned and the gins destroyed. News of the loss of the steamer was received by the defendant before the plaintiff received the bill of lading, so that the plaintiff could not give notice to the defendant of the shipment or request indorsement before the loss. On the afternoon of the 27th the plaintiff went to the defendant's office and requested indorsement of the gins on the policy. The request was refused. The court held that the underwriter had no right to refuse to indorse, that it was bound by the terms of its contract, and that the plaintiffs had within a reasonable time, and in good faith, given notice of the shipment; that all of the essential incidents to a completed contract were set out in the policy, so that there remained nothing more to be done thereunder; the defendant could not refuse its indorsement, and thereby throw upon the plaintiff a loss which it had contracted to bear. Upon the facts as here stated, there can be no criticism of what was held by the court. A completed contract of insurance was made at the time of the execution of the policy, and no exception can be taken to the reasonableness of the decision

that the plaintiffs had within a reasonable time, and in good faith, given notice of the shipment.

In the case of Hartshorn v. Insurance Co., supra, the words of the policy were:

"Property lost or not lost, on board vessel or vessels, steamboat or steamboats, or land carriage, at and from ports or places to ports or places; all sums at risk under this policy to be indorsed hereupon and valued at the sum indorsed;" and as to the rate of premium, "such per cent. as shall be written against such indorsement."

The court held the contract to be inchoate as to shipments of property ordered after the date of the policy; that a new and separate indorsement of each successive parcel of goods was required; that no risk could be legally indorsed on the policy without the consent of both parties. In the course of his opinion, Dewey, J., in reciting the facts of the case, distinguishes it clearly from E. Carver Co. v. Manufacturers' Ins. Co.

The other case cited and printed at length in the brief of the appellee,—Emery v. Insurance Co.,—the policy contained the following clause:

"On mahogany and other hard woods at and from Cuba and New Orleans to Boston; no risk to be binding until accepted by the company and indorsed herein."

In an action on an alleged oral agreement to indorse a risk upon said policy, the plaintiff testified that he said to the secretary of the insurance company that he had seen the clerk of the company a few days before, and had told him to enter up a certain sum on a certain cargo, and he would bring in the open policy and have it entered up when the invoice arrived. The secretary said, "All right." Held, that the jury would be warranted in finding from this evidence a waiver of a condition in the policy that no risk is to be binding until indorsed on the policy. It will be observed in this case that the question was as to the propriety of submitting to a jury the question of fact whether the condition as to indorsement of risk on the policy was waived or not,—a very different question from the one we are called upon to consider here.

We have not deemed it necessary, in the discussion of the question whether the evidence disclosed in the record was sufficient to justify the inference of a change in the contract as to the right to accept or reject a risk, to quote at length the testimony upon which our conclusion has been reached. We have contented ourselves with stating, after a careful reading of that testimony, what it failed to evidence. We may add, however, that the testimony of the marine clerk of the appellant, who received ordinarily the notifications of risk, treated them as applications for insurance, calculated the premiums upon them, and then ticked them for entry upon the policy ledger, and afterwards on the pass books given to the appellee. He testifies that in ordinary cases (which all or a great part of the risks assumed seem to have been) he considered that he accepted them by thus passing upon them, but that he was never authorized in any case of doubt as to the character of the

risk, or where there was anything unusual in the circumstances surrounding it, to accept the same without reference to the officers of the company. And he also testifies that he never accepted a risk, and had no authority to accept a risk, upon a steamer that was sunk before the risk was presented to him. To the same effect was the testimony of another witness, who usually made entries in the pass books, that he had no authority of any sort or kind to accept or to enter slips notifying of insurance on vessels that had gone down at the time he received the slips, and that, if he had known of any such fact in regard to shipments notified in the slips, he would not have accepted, or been authorized to accept, the same; that his instructions were, "if there was anything at all in the matter contained in the slips that called for attention, to report it to some officer for his judgment and action." The president of the appellee also swore as follows:

"Q. Did you ever before notify the Delaware Insurance Company, at any time, of an insurance, or the fact of an insurance, or of a shipment to be insured, after the vessel carrying the shipment had been lost? A. I do not recollect of any such instance."

It is true that the same witness testified that he supposed his policy attached upon goods as they were put on board the steamer, before any notice, but that he did not know that any officer of the insurance company ever said anything to him to justify any such statement.

The president of the appellant company testified as follows:

"Q. Had you any understanding with the S. S. White Dental Company about the outgoing insurance, when it became an insurance,—as to the time when it became an insurance? A. No understanding other than shown in the contract."

The same witness, without contradiction, also swore as follows:

"Q. When, after your communication on the morning of the 7th of July to the S. S. White Dental Company, did you next hear from them? A. Shortly afterwards, on the same day, the president of the company, Mr. Lewis, called upon me. Q. Tell us the conversation. A. I expressed my very great regret that we were placed in the position we were with an old and valued customer, and that the notice had not been received and entered and made fully binding previous to the knowledge of the loss of the vessel, and the necessity for our having to deny liability. Mr. Lewis said to me he felt we were not legally liable under the policy, but he felt there was an equity in the case which he would like to have me consider. I told him I was unable to deal with any question other than the legal liability of the company in the matter, but that if he desired to present a communication to our board of directors, I should be very glad to have him do so, and would see that it went before them with the full knowledge of the facts as they existed."

The same witness swore:

"Q. Do you know of any instances occurring during the time you were president of the company where you accepted, or the company, upon your opinion, have accepted, an insurance when notified after the loss of the vessel? A. No, sir. Q. Do you know at the time of this loss of any contract in existence covering your insurance of outward-bound shipments, other than the contract of the 1st of January, 1895? A. No, sir. Q. Did you know at that time, or did you know at any time during your presidency, of any other understanding, or implied agreement or custom, by which your company bound itself to

any risks until it had received notice and accepted the same? A. Never, on any outward business. I believe there are some policies, or have been some policies, in force, with that contract as to outside shipments,—some special contracts. Q. But they were special contracts? A. They were special contracts. Q. Did you know of any course of dealing, custom, or anything approaching it, amounting to a waiver by your company of any of the terms of the policy of the 1st of January, 1895, embodied in these words: 'No risk to attach to the policy until the amount and description of the same shall be approved and indorsed thereon by the company, and to be valued at the sum so indorsed'? A. No, sir."

There is other testimony to the same effect, but none at all as to the existence of any course of business inconsistent with the stipulation in the policy that no risk should attach until it was approved by the appellant company. The only testimony as to the existence of an understanding at variance with the policy in this respect is that of the president of the libelant company, already quoted. But this, as we have seen, is directly contradicted by that of the president and officers of the appellant company, and is supported by no facts from which an inference favorable to his testimony can be drawn.

The second general contention of the appellee is as follows:

"If the court should be of opinion that, although premiums had been agreed upon, and indorsement as a condition precedent had been waived, nevertheless this did not abrogate the right of the insurance company to accept or reject each risk as reported, then libelant claims that, even under such interpretation, this risk had been actually accepted by the insurance company."

We think that a brief review of the evidence already quoted or referred to on this point will be sufficient to dispose of it. The facts found by the court below, and disclosed by the record, are: That the shipment was made in New York upon the Bourgogne by agents of the appellee on the 30th of June, 1898. That the libelant's agents in New York who attended to this shipment forwarded the bill of lading to libelant's office in Philadelphia, by mail, on July 1, but, July 2d being a half holiday, July 3d being Sunday, and July 4th a legal holiday, the letter of the agent and the bill of lading were not seen at libelant's Philadelphia office until Tuesday, the 5th day of July. On the morning of July 6th the clerk of appellee, whose duty it was, proceeded to fill out slips, in order to report to the appellant all shipments which had been communicated to appellee, but had not been previously reported. He began his work shortly after 10 o'clock, and in about a quarter of an hour had filled up eight of these slips, one of them relating to the shipment by La Bourgogne. This slip has already been quoted. After eight slips were filled, he placed them on the desk of another clerk for mailing. They were forwarded by mail that morning, and reached the office of the appellant about 2 o'clock. The news of the loss of the Bourgogne had been learned by the appellant about 12 o'clock that morning. It does not appear with certainty at what time the news first reached the office of the appellee. It is not without significance, both in regard to the point we are now considering, and also on the question whether there was a settled understanding between the parties to the effect that

all shipments of appellee were insured from the date of such ship-ment, at its election, that a clerk of the appellee was sent down to the office of the insurance company on the 6th of July, shortly after the notice slips had been mailed. He testifies that he visited the office about 2 o'clock, under instructions from the president of the appellee. He says that he saw the clerk—Mr. Harry Yarnall—who had charge of the marine business, and one or two other clerks; that he asked Mr. Yarnall if he had received an application for insur-ance by the Bourgogne, and he said that he had, and he had in his hand the slip. "I stated to him that it had been mailed in the usual course of business, and we were very anxious to know whether they had received it in due course. He stated to me that it had come in some little time previous." "I stated to him that it was a large amount, and, as the news of the loss of the vessel had been reported, we wanted to feel sure that he had received the application, and we wanted to know where we stood about it. He stated that he thought everything would be all right, although he could not answer for sure, because none of the officers were in. I stated that we would like to know definitely just how everything was, and he said he would tele-phone to me,—he would call for me that afternoon. So I left with that understanding." It appears that the appellant company then consulted with the agents of the insurance company which reinsured all the appellant's marine risks. This agent said he would not rein-sure, and advised the representative of the appellant not to accept the risk. The next day the president of the appellant wrote to the ap-pellee, refusing to admit liability for the loss; and on the same day, after the receipt of that notification, the president of the appellee, the libelant below, called upon the president of the insurance com-pany, who testifies in regard to the interview as already quoted. This is the substance of the testimony relevant to this point. We think it shows a clear rejection of the risk by the appellant company, and of such rejection the appellee was informed, not only within a reasonable time, but promptly. The mere fact that the marine clerk indorsed the slip, as he indorsed the other seven in the packages, with the amount of the premium, and the usual check mark, which indicated that it was ready for entry in the ledger, cannot be held to countervail the positive testimony that, as soon as the unusual character of the application was known, it was held up for considera-tion by the officers of the company, and by them promptly rejected, and the appellee notified without delay. As we have already said, the routine course of business between the parties would seem to go no further than to show an understanding that all requests for insur-ance were considered as accepted, if notification to the contrary was not sent within a reasonable time. And, as we have before stated, nothing inconsistent with such an understanding has been shown in the dealings between the parties. We are therefore of opinion that the contention of appellee that the risk was, as a matter of fact, actually accepted, cannot be sustained, and that therefore the decree of the court below must be reversed, and the case remanded, with directions that the libel be dismissed.