## GLOBE & RUTGERS FIRE INS. CO. OF NEW YORK v. McGINNIS.

Circuit Court of Appeals, Ninth Circuit.
November 26, 1928.

No. 5565.

Dietrich, Circuit Judge, dissenting.

Orrick, Palmer & Dahlquist, of San Francisco, Cal., and Ellinwood & Ross, of Bisbee, Ariz. (Robert L. Hall, of San Francisco, Cal., of counsel), for appellant.

Stanley Samuelson, of Florence, Ariz., and Otto E. Myrland and Lesley B. Allen, both of Tuchon, Ariz., and Oscar T. Barber, of San Francisco, Cal., for appellee.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

RUDKIN, Circuit Judge. This is an appeal to review a judgment in favor of the plaintiff on an oral contract of insurance. The sufficiency of the testimony to support the verdict is the only question presented for consideration. Taking the view of the testimony most favorable to the appellee, as we must, the facts are substantially as follows: March 26, 1927, the appellant, through Commercial Realty & Trust Company, its agency at Douglas, Ariz., issued a policy of insurance to T. P. McGinnis, the husband of the appellee, insuring him in the sum of $2,500 against loss or damage by fire on a store building, merchandise, and fixtures for a period of one year from that date. June 10, 1927, the agency at Douglas notified McGinnis of the cancellation of this policy, to take effect five days after the date of service of notice. While not so stated in the notice, the apparent reason for the cancellation was that the insured had been convicted of the crime of receiving stolen property and the company deemed the risk a bad one. June 18, 1927, the appellee called at the office of the agency of the company at Douglas and found in charge of the office a girl of about 17 years of age, who was employed there as a stenographer or clerk. The appellee produced the insurance policy theretofore is-

sued to her husband, which had been canceled about a week before, stating that she wanted one like it in her own name. The girl answered, "All right," and informed the appellee that the amount of the premium was $103.75. The appellee gave a check for this amount, taking a receipt therefor signed by the agency, and was informed by the girl that she would mail the policy out in a few days. All this occurred between 9 and 10 o'clock on Saturday morning, and the manager of the agency found the check on his desk at about 12:30 p. m., after the girl had left the office for the day. On the Monday morning following, the manager mailed a letter to the appellee returning the check and informing her that the notice of cancellation, to which we have referred, was not to make collection, but was sent out at the request of the company, and that the company was compelled to cancel the policy as stated in the former notice. It is apparent from this letter that the writer was under the impression that the check had been left at the office in payment of the premium on the old policy which had been canceled and not for new insurance, but this fact is not material. On Monday night, after the mailing of this letter, but before its receipt by the appellee, the property covered by the old policy was destroyed by fire.

It is an elementary rule of law that an insurance company, or other corporation, is not bound by a contract entered into in its behalf, unless the person making the contract had either actual or apparent authority to make it, or unless the unauthorized contract has been ratified by the company, and the burden of proof is on the party claiming under the contract to prove not only the making of it, but the authority of the person by or through whom it was made. Lauridsen v. Bowden, Gazzam & Arnold, 107 Wash. 310, 181 P. 885.

Ordinarily, an agent possesses the powers conferred directly upon him by his principal and certain incidental powers based on necessity or custom; and such other powers as the principal has, by his direct act or by negligent omission or acquiescence, caused or permitted persons dealing with the agent reasonably to believe that the principal had conferred and upon which such persons have relied. Mechem on Agency (2d Ed.) § 729.

Here, the testimony shows conclusively that the girl was without authority in fact to bind the insurance company by contract, and there was no direct act of the principal that would reasonably induce any person to believe that she had such authority.

Nor was there negligent omission or acquiescence on its part such as would lead any person so to believe. It was never represented by the company or otherwise that she had authority to make contracts in its behalf, and so far as the record discloses she had never made a like contract before, either with or without the knowledge of the company. In short, there is nothing in the record to support a finding of authority aside from the bare fact that the girl was found in the insurance office alone. As is customary in such places, the general business transacted in the office in which the girl was employed was real estate, rentals, loans, and insurance, and had she undertaken to contract in behalf of her employer in any other branch of its business, it would scarcely be claimed that the employer would be bound by her act. Contracts of insurance do not stand upon any different footing. It may be that persons dealing with clerks employed in insurance offices take too much for granted and assume that such clerks have authority which they do not in fact possess, but unless they are justified in this course by some direct act of the company, or by some negligent omission or acquiescence on its part, the misfortune is their own, if they find themselves in possession of contracts of insurance made without authority, or even the semblance of authority. Gude v. Exchange Fire Ins. Co., 53 Minn. 220, 54 N. W. 1117; Meadows v. American Eagle Fire Ins. Co., 104 W. Va. 580, 140 S. E. 552; Delaware Ins. Co. of Philadelphia v. S. S. White Dental Co. (C. C. A.) 109 F. 334, 65 L. R. A. 387; Maryland Casualty Co. v. City of Cincinnati (D. C.) 291 F. 825; Morse v. St. Paul Fire & Marine Ins. Co., 21 Minn. 407; Fleming v. Hartford Fire Ins. Co., 42 Wis. 616.

The two cases cited by the appellee are not to the contrary. Southern Life Insurance Co. v. McCain, 96 U. S. 84, 24 L. Ed. 653, but states the familiar rule that no company can be allowed to hold out another as its agent and then disavow responsibility for his acts, and that after it has appointed an agent in a particular business, parties dealing with him in that business have a right to rely upon a continuance of his authority until in some way informed of its revocation. International Trust Co. v. Norwich Union Fire Ins. Society (C. C. A.) 71 F. 81, simply holds that an insurance company is bound by a notice that a policy had been renewed when information to that effect was given by an employé of the agent of the company in the line of his duty. Here, as we have seen, there was no holding out, and the act of the girl

in making the contract of insurance, if one was in fact made, was not in the line of duty.

The court below erred, therefore, in refusing to direct a verdict for the defendant; and for this error the judgment is reversed.

DIETRICH, Circuit Judge (dissenting). While I am inclined to think the evidence would warrant a finding of actual authority on the part of Miss Moore, the assistant or clerk, it is necessary only to consider the question of her apparent authority.

Of course, the general principles of ostensible agency are always the same, but that is not to say their application always produces the same results. Under modern usage, the issuance of fire insurance policies is in a large measure a routine and clerical function. The companies furnish their agencies with descriptive plat books, rate schedules, and policies of standard form which are easily filled out. The policies themselves are so framed as automatically to protect the companies upon the major subjects—such as false representation or the concealment of material facts, insurable interest, and over-insurance, etc. The issuance of a policy ordinarily requires the exercise of little more discretion or judgment than the selling of a railroad ticket, and, both in procuring insurance for the insured and in writing it for the insurer, the duty is not uncommonly delegated to employés serving in a subordinate capacity.

The apparent authority of Miss Moore is therefore to be determined in the light of these conditions. Appearances which would justify dealing with one in the purchase of a railroad ticket upon the assumption that he is an authorized agent of the railroad company might be far from sufficient to warrant dealing with him for the construction of a station building. So here, appearances which would reasonably generate the belief that Miss Moore was authorized to write fire insurance might be wholly inadequate to justify dealing with her for the sale of a house and lot—a transaction involving the exercise of judgment and discretion, and the use of a special, instead of a form, contract.

At page 469 of volume 2 of Clement on Fire Insurance, it is said: "An insurance company is responsible not only for the acts of its general agents but also for the acts of clerks and employees of the agents to whom they delegate authority to discharge their functions within the scope of their agency." In Goode v. Georgia Home Ins. Co., 92 Va. 392, 395, 23 S. E. 744, 745, 30 L. R. A. 842, 844, 53 Am. St. Rep. 817, the Supreme Court of Virginia uses this language: "It being necessary, therefore, and according to the usual course of business, for their agents to employ others to aid them in doing the work, it is just and reasonable that insurance companies should be held responsible, not only for the acts of their agents, but also for the acts of their agents' employees, within the scope of the agents' authority." And in International Trust Co. v. Norwich Union Fire Ins. Society, 71 F. 81, 87, the Circuit Court of Appeals for the Eighth Circuit very aptly says: "It is customary for agents having charge of important agencies to employ persons to perform clerical and much other work in their office, and to assist them generally in the discharge of the various duties which such agents have to perform. The business of insurance could not well be transacted without such assistants, and all insurance companies are doubtless well aware of the practice of employing them. It results from this well-known business usage that acts done and information given by such subordinate employés in the line of their duty should be held binding upon the companies which they represent. We think, therefore, that presumptively Shepard had authority to inform Gibson whether the policy now in question had or had not been renewed, and that the statement made by him should be given the same effect as if it had been made by either Benson or Kirtland."

Turning now to the record for the facts: Testifying for the defendant, Miss Moore herself clearly discloses the conception she had of her authority, before her mind was affected by any controversial interest, in the following bit of pregnant testimony: "After he (the manager) came back when I told him about this transaction he told me I should not have accepted the money. I asked him why, and he said because the policy had been cancelled by mail. That explanation did not satisfy me, and I told him I felt sorry for Mrs. McGinnis. He asked me why; he said I should not, and I said: 'Well, I do because I would hate to think I could not carry insurance; that it had been cancelled out on me'; and he said, 'Well, it is the thing, we have to carry on business that way.'"

Even under the shifting if not evasive testimony of the manager, she was undoubtedly authorized to, and in practice did, perform important duties in the issuance of policies. She not only wrote up the policies under his general supervision, and thus became familiar with what was required, but she was able to compute premiums and was

authorized to receive payment of them. While the manager first testified that she had authority to accept such payments only upon policies that had been written and approved by him, on being pressed he admitted that he had given general instructions not to let any money offered get away, and that she was authorized to accept premiums from an applicant for new insurance, but that before the policy was issued the application must be submitted to him for the computation of correct rates. On cross-examination he further testified: "I did not tell her directly not to accept it (payment of premiums upon policies to be written). If she was able to tell from materials laid before her regarding certain premises what the specific amount of the premium would be she would then be authorized to accept the application but not to execute the policy. She would be authorized in such case only to accept the money for my approval and consideration."

. Here was a concern with only two employés, a manager and his office assistant or clerk. Besides insurance, it was engaged in the real estate and loan business. In carrying on this business, in showing and inspecting property, the manager would necessarily be absent from the office a substantial part of the time. During his absence the assistant was in charge. There is no testimony that if at such times Smith or Jones, desiring immediate insurance, came to the office, the assistant was to advise him she could not accept his application or protect him, with the request that he return when the manager came in. With such advice, in all probability, he would go to some other agency and the business would be lost. To the contrary, she was instructed to take the premium, not to let any money get away. Can it be supposed that any property owner so desiring insurance would pay his money and go his way if he had any intimation or thought that the policy might not be issued, and that consequently he was exposed to the peril of disaster? Or can it be possible that in authorizing such conduct on the part of his clerk the manager had any doubt that it would lull customers into a feeling of security and dissuade them from going elsewhere for insurance, all to their hurt if a loss occurred, and he later declined to issue the policy for which he had thus accepted payment?

Specifically, then, we have a case where a woman finding a policy, written upon her property but in her husband's favor, went to the insurance agency for the purpose of having a new policy of identical form written in her name, and paying the premium thereon. If the circumstance be deemed at all material, it is to be said that she had no knowledge of the notice of intended cancellation of the existing policy which a few days before had been mailed to her husband. She went to an agency that had not only issued this policy but earlier ones on the same property. The agency openly advertised its insurance business. She found in the office and in charge thereof but a single person. Upon stating to such person what she wanted and being informed of the requisite premium, she paid the amount, took a receipt therefor, and went her way with the assurance and in the belief that a formal policy would be sent to her in a few days. There was nothing in the surroundings or any circumstance to suggest that this occupant of the office was without authority to do what she did and agreed to do. Admittedly such person was authorized by the agency to receive payment of her money. What more persuasive assurance could have been given the plaintiff of the person's authority to write the policy than such acceptance of her money? For what possible purpose could the agency have authorized acceptance of premiums in advance of a determination that the policies would be issued other than to induce those desiring insurance to act in that belief? Authority to accept money certainly creates an appearance of authority to deliver the consideration therefor. If the contention now made that the money was to be taken with the secret understanding between the manager and his assistant that no policy would issue until and unless the former approved the application be correct, the authorized act of accepting it would constitute a fraud, and would operate as an estoppel of the strongest character.

Moreover, as fortifying these considerations of estoppel, we have as an additional circumstance the unreasonable inaction of the manager after he learned what his assistant had done. Plaintiff's place of business was at Kelton, only about 35 miles from Douglas. Between the two towns there was communication by mail, telegraph, and telephone. As stated in the majority opinion, the manager came to the office about 12:30 p. m., two or three hours after the transaction, and learned that the check had been accepted by his assistant. He did not try at all to reach plaintiff by telephone or telegraph, and did not even write her until two days later. It is no answer to say that he may have assumed the check was left to pay

the premium on the policy which he had notified plaintiff's husband he intended to cancel. Whether the check was for the one purpose or the other, he knew that plaintiff had left it to secure protection against loss by fire—to pay for insurance which she did not have, as he further knew, if the contention he now makes be correct. He was undoubtedly familiar with the almost universal practice of carrying fire insurance and the common concern of property owners in seeing that their insurance does not lapse even for a day. Yet for two days he made no use whatsoever of the instrumentalities ready at hand to advise her of his attitude and thus warn her of her peril, and when he did communicate, he chose the least expeditious means. Had he acted with reasonable diligence, she would have had time to get insurance elsewhere before the loss occurred. That she could have obtained it through another agency, where she was carrying a small policy, the record leaves no doubt. Upon familiar principles, such delay, under circumstances calling loudly for immediate action, should in itself be held sufficient to defeat appellant's defense.