METROPOLITAN LIFE INS. CO. v.
HENDERSON.

No. 8458.

Circuit Court of Appeals, Ninth Circuit.

Nov. 9, 1937.

892

Preston, Thorgrimson & Turner, of Seattle, Wash., and F. Eldred Boland, J. W. Radil, and Knight, Boland & Riordan, all of San Francisco, Cal., for appellant.

Geo. H. Crandell, of Seattle, Wash., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

Appellee sued to recover commissions claimed to have been earned over a period extending from March, 1928, to November, 1933, under the terms of an oral contract for the procurement of applications for in-dustrial life insurance policies. The defendant denied the oral agreement and alleged the existence of a written contract covering the terms of the employment. It denied that under the latter there was any amount owing, and asserted that appellee had been paid and had accepted payment in line with the written contract. The jury returned a verdict in the amount prayed for, and this appeal followed. The single question presented for review is the sufficiency of the testimony to support the verdict.

Keeping in mind our obligation to view the evidence in the light most favorable to appellee, the facts shown may be recited in substance as follows:

Appellant is a corporation having its headquarters in New York. Prior to his engagement as a solicitor, the appellee filled out, signed, and presented to appellant an application for employment. The application is directed to the Metropolitan Life Insurance Company. It contains a paragraph reading, in part, "I further agree, if my appointment as Agent is approved by the Company, that my compensation shall be in accordance with the present schedule of salaries or commissions, or both, payable to Agents, and as the schedule or terms thereof shall be amended by the Company from time to time; that I will abide by all the rules and regulations of the Company as embodied in the Agent's Instruction Book and otherwise, and as they may be subsequently amended."

The schedule of salaries and commissions for agents in force at that time, and which continued in effect throughout the period, provided that the agent would be paid each week a collection salary for collecting premiums on policies in force, and a special salary for procuring new business and reinstatements. We are not here concerned with the collection salary, which varied in amount, according to the schedules, from $15 to $43 per week, and which appellee was regularly paid. The dispute concerns the special salary.

It was the custom of the appellant in the territory served from its Seattle office, where appellee was employed, to assign to each agent or solicitor a specific area, called a "debit," to which his labors were confined. To arrive at the special salary to which an agent was entitled, it was provided in the schedules that a quarterly account of the new business written and old business lapsed would be made at the end

of the quarter. From this quarterly statement the total of the special salary for the ensuing quarter would be computed. The latter amount was to be divided by 13, the number of weeks in the quarter, and the quotient arrived at was the weekly special salary to be paid during the ensuing quarter. The business solicited by appellee was mainly what is known as industrial insurance. In this form of insurance the premiums are small and are payable on a weekly or monthly basis. The commissions of the agent on business obtained through his solicitation were 24 times the amount of weekly premiums and 5½ times the monthly premiums, on business written or revived. Against these commissions were to be charged, at the same rate, the premiums on policies lapsed during the quarter in the agent's territory. The net difference constituted the special salary. It was so provided in the schedules of the company. These schedules were said by appellant to have been posted in the room of the Seattle office where the agents had their desks.

The answer of appellant sets out the application for employment, alleges that it was orally accepted, and that plaintiff, upon oral notification of such acceptance, entered the employ of the appellant under a written contract evidenced by the application and acceptance. The answer incorporates the schedule of salaries and commissions payable to agents as heretofore described. It is the contention of the appellant that under the terms of the contract these schedules governed the compensation of appellee.

The application and the existence and terms of the schedules are facts not disputed by the appellee, although he denies having seen or known the contents of the latter. His position, in brief, is that an oral agreement was made between himself and the company, acting through an assistant manager of the Seattle office, under the terms of which he was to be paid commissions amounting to 24 times the weekly premiums and 5½ times the monthly premiums on business obtained or revived by him, without any deduction on account of policies lapsed.

The evidence by which appellee claims to have established his oral contract is in substance this:

In March, 1928, appellee went to the Seattle office of the appellant company and there met a Mr. Allen, who was an assistant manager of the office. Appellee was given the form of application for employment heretofore described, to be filled out and returned. After filling out, signing, and returning the application appellee was told by Allen to come back in about 2 weeks. When he returned at the time indicated Allen took him out and showed him how to solicit insurance. Later he was called by telephone to report, and at that time he met a Mr. Martin, another assistant manager of the Seattle office. Mr. Thompson, who was the manager of the Seattle district for the company, introduced appellee to Martin, telling him that appellee was approved for work, approved by the company, and if Martin saw fit to introduce him on the territory it met with the approval of the manager. The assistant manager first instructed appellee with respect to the methods which were used for crediting collections, and later introduced him to people in a certain area in Seattle and made him familiar with the territory. Appellee went around with Martin for several days, during which time he was told by Martin that he was to receive a collection salary for collecting premiums, which would amount to about $25 per week. With reference to the compensation he was to receive for writing business, Martin told him that he was to receive 24 times the weekly premiums and 5½ times the monthly premiums on new business. Nothing was said by Martin about his being charged with lapses of policies. It was usual for the manager and assistant managers of the local office to discuss contracts and methods of payments with all agents.

After a week or 10 days the territory was turned over to appellee, at which time Martin told him to go out and begin writing business. He first had his attention drawn to the matter of lapses about 3 months after he went to work. He was watching for his commissions to start. He then received from the home office of the company what was apparently the quarterly account referred to in the schedules, showing how much business he had written. In it there were lapses charged against him. When he got this statement he took it to Martin, the assistant manager, and demanded his commissions, saying to Martin that he could not stand for the lapses that had been charged against him. Martin told him to keep quiet and it would be adjusted and that he would get his commissions. At various times he discussed the lapses with Martin. The latter told him to keep quiet,

that he would get his adjustments and was to be promoted to assistant manager and was to receive a statement and get his commissions in full. During the early part of the employment Martin told appellee's wife that if appellee would be quiet he would get an adjustment of his commissions. In the fall of 1928 appellee tried to discuss the lapses with the manager, Thompson. The latter said to talk with the assistant manager, that was the one that was handling it. After that he did talk to Martin from time to time. For a year and a half before appellee left the employ of the company Martin was at Bremerton and appellee saw him but seldom. It was shown, and the fact is not disputed, that appellee ceased to be under the supervision of assistant manager Martin after the first year and a half of his employment.

Appellee found out at the end of the first quarter that the lapses were being charged against him. He was given a quarterly statement at the end of the first quarter and at the end of each succeeding quarter during the entire period of 5½ years he continued in the company's employ. On all of them the lapses were shown and were charged against his account. In these quarterly statements his salary for the ensuing quarter was computed and fixed. The salary paid and receipted for each week was the amount of salary as shown by the quarterly statement for the prior quarter. He received his pay weekly and signed weekly receipts for salary. These receipts uniformly contained the following verbiage: "I hereby acknowledge receipt of the amount of net payment shown above. This amount is the result of computations made on the forms mentioned, and on Forms P C 51 and P C M 51, *Quarterly Statements of Agent's Salary Accounts, showing the compensation to which I am entitled for the present quarter*, which forms have all been received and checked by me, as required by the Company's rules." (Italics supplied.)

▉ This proof affords no substantial basis for the judgment appealed from. The application for employment which appellee signed was an offer to contract on the terms specified in it. It is elementary that the acceptance of the offer gave rise to an agreement, evidenced by the written application. It was perfectly competent for the parties to make, as they did, the schedules of the company a part of the contract by mere reference to them. These docu-

ments were readily subject to identification, and there is no dispute here concerning either their existence or their terms. Benson v. Metropolitan Life Insurance Co., 126 Wash. 125, 217 P. 709; Green v. National Casualty Co., 87 Wash. 237, 151 P. 509; Friedman v. Metropolitan Life Insurance Co., 250 App.Div. 195, 293 N.Y.S. 757. Under the agreement the compensation of the employee was to be determined in accordance with these schedules. If appellee was not shown the schedules to begin with, at least his attention was called to them every time he received the quarterly statement of his account, since not only was his account computed on the basis of the schedules but in these quarterly statements the poster schedules were specifically referred to by number. The appellant was bound by its schedules. Appellee was likewise bound by them, whether content with their terms or not. Nor is it material whether he saw or read the schedules, since it was his business to see and examine them. For a like reason he was not entitled to rely upon information obtained from Martin as to what his pay would be.

▉ This contract became effective at the inception of the relationship. It was of course competent for the parties to modify or abrogate it. But in that event both parties must agree to the modification, and there is no proof here that appellant agreed upon any change. There is no showing that the manager of the Seattle office, or any of his assistants, was authorized to employ solicitors without company approval or to agree with solicitors upon the measure of their compensation. On the back of the application for employment which appellee signed are printed two series of questions, one denominated "Assistant Manager's Report on Application for Agency," and the other denominated "Manager's Report on Application for Agency." These reports were obviously intended for the information of the company, and the recommendations of the two local officials were called for in them. The whole document refutes the idea that the applicant was to be employed either by the manager or by the assistant manager, and indicates that the employment was to be determined by the company itself. There is undisputed evidence that the assistant manager, with whom it is claimed the oral agreement was made, had no authority to contract with solicitors with respect to their compensation. Apparent or ostensible authority of this kind in the local supervising officials

must be found, if at all, in the facts and circumstances heretofore recited. As said by this court in Globe, etc., Fire Insurance Co. v. McGinnis, 29 F.(2d) 357, 358, "It is an elementary rule of law that an insurance company, or other corporation, is not bound by a contract entered into in its behalf, unless the person making the contract had either actual or apparent authority to make it, or unless the unauthorized contract has been ratified by the company, and the burden of proof is on the party claiming under the contract to prove not only the making of it, but the authority of the person by or through whom it was made."

"Apparent authority to do an act may be created by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes a third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." Restatement of the Law of Agency, § 27. "Apparent, authority * * * is that which, though not actually granted, the principal knowingly permits the agent to exercise, or which he holds him out as possessing." 2 Am.Jur., Agency, § 101. The appellee had knowledge at the inception of the relationship that his compensation would be determined from the schedules of the company in force. This in itself was notice that his pay was not to be fixed by agreement with those in charge of the local office. The quarterly statements computing appellee's salary were not made up by Martin or the manager, nor even made up in the Seattle office. They came from the home office of the company. Throughout his employment from March, 1928, to November, 1933, appellee continued to receive these quarterly statements and to receipt weekly for his salary on the basis of them. The quarterly statements computed his pay in conformity with the schedules, and as has been said referred to the schedules by number. This uniform practice, adhered to by the company over the whole of this long period, was ample notice to appellee of the lack of authority in his immediate superiors to agree with him upon his compensation, and indicated unmistakably that the appellant understood the original contract to be in full force. Appellee was clearly put upon inquiry concerning the authority of these parties to make the oral contract which he says was made with him. "If the very facts on which the person employed relies as a holding out themselves give warning that the agent has but a limited authority, he must investigate to discover those limitations." 2 C.J.S., Agency, § 105a. While presumably the local managers were expected to adjust with solicitors specific items of charge or credit where errors appeared or were claimed, the appellant sedulously avoided clothing them with actual or ostensible authority to agree with solicitors concerning the basis of their pay. The assistant manager's statement to the appellee to "keep quiet and he would get his commissions" did not give rise to an oral contract binding upon the company.

From beginning to end the engagement between these parties was performed on the basis of the original agreement. Appellee was uniformly supplied with statements of his account and as uniformly receipted for his salary on that basis, acknowledging each week receipt of "the compensation to which I am entitled." No fraud or mistake is charged. It is urged by appellant that under the circumstances here disclosed these periodically recurring statements constituted a series of accounts stated, or gave rise to an accord and satisfaction. Numerous authorities are cited in support of this contention. These circumstances serve further to demonstrate the entire lack of merit in appellee's claim. But it is unnecessary, in view of our conclusion that no oral contract was established, to consider these added points discussed by appellant.

The judgment is reversed, and a dismissal ordered.